October 3, 2005

Ms. Lynda Riesgo Jensen
Attorney-at-Law
Martin, Magnuson, McCarthy & Kenney
101 Merrimac Street
Boston, Massachusetts 02114-4716

Dear Attorney Jensen:

I have reviewed the materials that you sent to me for review in the case of William Emde and Judith Emde vs. David Smith, M.D. I have reviewed the hospital records from the Winchester Hospital as well as the plaintiffs' offer of proof. I have also reviewed depositions given by William Emde, Judith Emde, Dr. David Smith, Dr. Amy Anderson and Dr. Wesley Farris. I have not reviewed the deposition of Dr. Allen Jeremias because it was not included in the materials you sent to me.

At the time of the events in question, Mr. William Emde was a 62 year old man with a history of diabetes mellitus and severe peripheral arterial vascular disease. He had previously undergone a vascular reconstructive operation in September 2003, and was readmitted to the Winchester Hospital for a revision of the graft which had been placed and was failing. The patient underwent a revision of a bypass graft to his left lower extremity on November 19, 2003. The procedure was a very distal bypass to the foot, and it was performed under epidural anesthesia. The patient was on anticoagulants at the time of the operation and was maintained on anticoagulants immediately after the operation. On November 22, 2003, the patient began to complain of back pain and developed some neurological deficits involving his lower extremities as well as his right upper extremity. He was seen on rounds by Dr. Amy Anderson and Dr. David Smith, neither one of whom actually participated in the operative procedure. Later in the day of November 22, 2003, Mr. Emde's symptoms became worse and he became hypertensive. He was seen by an intensivist, Dr. Allen Jeremias, for control of his hypertension. His anticoagulant medications were stopped, and his epidural catheter had been removed. A CT scan of the abdomen was done to rule out an intraperitoneal hemorrhage, and a CT scan of the brain was done to rule out an intracerebral hemorrhage. These studies were essentially negative. Because of the patient's continuing complaints and problems, Dr. Smith came into the hospital to examine the patient early in the morning of November 23, 2003. He contacted Dr. Anderson, discussed the matter with her, and subsequently contacted Dr. Wesley Farris, the consulting neurologist. As a result of the discussion with Dr. Farris, Dr. Smith documented in a progress note that the diagnoses under consideration were psychosomatic exaggeration of actual deficits, Guillain-Barré Syndrome, and possible spinal cord compression. There is some disagreement as to the exact details and content of the communication between Dr. Smith and Dr. Farris, as well as between Dr. Smith and Dr. Anderson. Dr. Smith's note indicates that the most likely of the diagnoses

Case 1:04-cv-11987-MLW    Document 63-2    Filed 08/24/2006    Page 2 of 3

Ms. Lynda Riesgo Jensen
October 3, 2005
Page 2

under consideration was the psychosomatic exaggeration of actual deficits, as suggested by Dr. Farris. The diagnoses of Guillain-Barré syndrome and spinal cord compression were felt to be not as consistent with the clinical picture, and were therefore less likely. Steroids were felt to be not appropriate for use in this clinical situation. It was Dr. Smith's understanding that Dr. Farris did not suggest that further radiologic studies be done at that time. Dr. Smith also notes that he once again consulted with Dr. Anderson, who agreed with the plan of management as suggested by Dr. Farris. In Dr. Anderson's deposition, however, she indicates that she did not remember this specific discussion with Dr. Smith and was not aware of subsequent events until later in the morning of November 23, 2003. In Dr. Farris' deposition, he indicates that he strongly recommended a CT scan to rule out an epidural hematoma in the spine. However, this was not what Dr. Smith understood Dr Farris to say, and there is no documentary evidence of what Dr. Farris did or did not say to Dr. Smith other than the contemporaneous note that was written by Dr. Smith. Dr. Farris did not offer to come into the hospital to see the patient. At the time of the discussion with Dr. Smith, Dr. Farris indicated that he would see the patient in the morning.

At the time of this series of events, Dr. David Smith was a resident in general surgery at the New England Medical Center. He was assigned to the Winchester Hospital, where he functioned as a chief resident. Dr. Smith's training was in general surgery and not in vascular surgery. In Dr. Smith's role as chief resident, it should be noted that he was still functioning as a resident and did not have any authority over any other physicians at the Winchester Hospital, with the possible exception of other residents in general surgery from the New England Medical Center who may have been assigned to that hospital. As a resident, Dr. Smith was not functioning as an independent surgeon on the staff of the Winchester Hospital, but rather was functioning in the role of a trainee. Dr. Smith was in his fourth year of a five year residency program. He was, therefore, not fully trained in general surgery and certainly not fully trained in vascular surgery. His authority and responsibility for patient care was a derivative one, based on his status as a resident. Therefore, the ultimate authority and responsibility for patient care rests with the attending physicians and it does not rest with the residents. The resident's role in matters of patient care such as this is to be the first line of response to deal with clinical problems and to coordinate the care with members of the attending staff. The resident may make suggestions for care and even order certain tests and care procedures, but he can only do so in conjunction with the decisions made by members of the attending staff. The resident may countermand or override orders given by the attending staff, but can only do so in conjunction with a higher authority in the hierarchy of the hospital staff structure. If a resident strongly disagrees with an action or lack of an action taken by a member of the staff, the resident may communicate that concern with the attending physician or may take it to a higher authority, such as the designated chief of service or the chief of surgery within the hospital for resolution.

In this case, in my view and with a reasonable degree of medical certainty, Dr. David Smith acted in an appropriate fashion as would be expected of the average resident in general surgery. He was aware of the patient's complaints, initiated several diagnostic studies and therapeutic efforts, and communicated with the responsible attending surgeon, Dr. Anderson. He also came into the hospital in the early hours of November 23, 2003, and sought the advice of the attending surgeon as well as the consulting neurologist. Even though there is a discrepancy in terms of the information that was transmitted during the course of these discussions, there is no reason, in my

Ms. Lynda Riesgo Jensen
October 3, 2005
Page 3

view, not to believe the general content of Dr. David Smith's progress note written in the morning of November 23, 2003. Dr. Smith carried out his obligations to the patient by reporting and discussing the clinical situation with an attending surgeon and a consulting neurologist, both of whom had more authority and more experience than Dr. Smith himself had. In addition, he had the report of Dr. Jeremias, who was also more experienced in these clinical matters. There was no specific reason for Dr. Smith to countermand or override orders or a management plan that was determined by physicians with more experience, responsibility and authority.

While the clinical situation may be clear in retrospect, it was not clear in prospect. The physicians dealing with Mr. Emde were clearly puzzled by the course of events. The diagnosis of an epidural hematoma is not always easy to make and, in fact, it is a relatively rare complication of epidural catheterization. In my opinion, and with a reasonable degree of medical certainty, Dr. David Smith acted appropriately, as one would expect of the average resident in surgery in communicating with his attending physicians and consultants, in coming in to the hospital to examine Mr. Emde, and in coordinating the care of Mr. Emde. While the outcome in this case is indeed unfortunate, it is my opinion that Dr. David Smith acted appropriately within the context of his position as a resident in general surgery, and that there was no deviation from the standard of care expected of a resident in general surgery.

Please let me know if you have any questions or would like me to address any other issues.

Thank you for the opportunity of reviewing this matter.

Sincerely yours,

Paul Friedmann, M.D.
133 Wild Grove Lane
Longmeadow, MA. 01106

PF/am